VETCO, INC. AND SUBSIDIARIES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 45506-86.        Filed November 28, 1990.

*John W. Armagost* and *Paul L. Freese,* for the petitioner.
*John O. Kent* and *Kim A. Palmerino,* for the respondent.

WRIGHT, *Judge:* By notice of deficiency dated October 2, 1986, respondent determined the following deficiencies in and addition to petitioner's Federal income tax:

|  |  | Addition to tax |
| TYE | Deficiency | Sec. 6653(a) [1] |
| --- | --- | --- |
| 4/30/74 | $289,885 | $14,494 |
| 4/30/75 | 8,664,734 | - - - |

Respondent also determined that interest on the deficiency for taxable year ended April 30, 1975, is to be computed under section 6621(c) (formerly section 6621(d)).

After concessions,[2] the issues for decision are: (1) Whether the wholly owned United Kingdom subsidiary of a Swiss controlled foreign corporation (CFC) is a branch or similar establishment within the meaning of the branch rule of section 954(d)(2); and if so, (2) whether the United Kingdom subsidiary was engaged in manufacturing so as to result in subpart F income to the Swiss CFC by operation of the section 954(d)(2) branch rule.

### FINDINGS OF FACT

Some of the facts of this case have been stipulated and are so found. The stipulation of facts, together with the

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Petitioner concedes the addition to tax for the year ended Apr. 30, 1974, if we uphold the underlying deficiency for that year. Furthermore, petitioner concedes that if we hold for respondent on the subpart F issue, it will not contest the accuracy of respondent's computation of the deficiencies.

exhibits attached thereto, is incorporated herein by this reference.

## Background

VETCO, Inc. (hereinafter referred to as VETCO or petitioner), was incorporated under the laws of the State of California. Petitioner's principal place of business was in Ventura, California, when it filed its petition in this case.

During the years at issue, VETCO was involved in engineering, manufacturing, marketing, and selling proprietary equipment for worldwide use in exploratory and development drilling, and in the production of offshore oil and gas, primarily in connection with floating drilling rigs in deep water applications. VETCO also provided tubular inspection and anti-corrosion coating services for the petroleum industry, as well as general petroleum industry sales and services. These activities were carried on domestically by VETCO's subsidiaries and sales offices located in California, Texas, and Louisiana, as well as internationally in Australia, Brazil, Canada, England, France, Holland, Italy, Japan, Nigeria, Scotland, Singapore, South Africa, Switzerland, and West Germany. For the years at issue, the United Kingdom's corporate income tax rate exceeded Switzerland's.

During the years at issue, VETCO's group of proprietary products included specialty connectors which had been designed and manufactured[3] for offshore drilling use to facilitate the connection of steel pipe products in a minimum amount of time. The pipe sizes suitable for connection with the specialty connectors ranged from 20 to 183 centimeters in diameter. VETCO sold the connectors either as separate items or welded to a length of pipe.

This case involves VETCO's specialty connectors and centers on the activities and relationships of a United Kingdom subsidiary of VETCO's wholly owned Swiss holding company. The United Kingdom subsidiary maintained facilities in Aberdeen, Scotland, which, during the years at issue,

---

[3]One of the issues in this case involves whether within the meaning of sec. 954(d)(1)(B), as applicable through sec. 954(d)(2), property was "manufactured" outside Switzerland. Any reference in our Findings of Fact to "manufacturing," "assembly," "fabrication," or "product" shall be for convenience and not be legally determinative.

served as a principal service and supply depot for oil drilling activity in the North Atlantic Ocean.

## *VIAG*

In October 1968, VETCO exercised an option to acquire all the stock in Oelfeld Bohrgestange-Dienst, A.G. (OBD), a privately held Swiss company, in exchange for VETCO common stock. OBD was organized in 1961 and engaged in the European sales of oil field materials, including tungsten carbide and weld wire. The owners of OBD were family members of the principal owners of VETCO. Prior to its acquisition by VETCO, OBD had organized a wholly owned United Kingdom subsidiary, Oilfield Tubular Service Company, Ltd. (OTS). OBD organized OTS to perform nondestructive tubular goods inspection services under a license from an unrelated U.S. corporation, AMF-Tuboscope, Inc. After its acquisition by petitioner, OBD's name was changed to Vetco International, A.G. (VIAG), and OTS's name was later changed to Vetco Offshore, Ltd. (VOL).

During the years at issue, VIAG was classified as a Swiss holding company and, as such, it had no employees but paid Swiss Federal and cantonal income taxes. In order to maintain VIAG's preferential Swiss tax status, Vetco Management, A.G. (Vetco Management) was formed in Switzerland for the purpose of performing operating functions (on behalf of VIAG) for which VIAG, and all other subsidiaries of petitioner, paid management fees. Vetco Management employed from 12 to 18 people during the years at issue.

When petitioner acquired VIAG in 1968, oil exploration and discovery was under way in the North Sea. VIAG, under license from VETCO, sold oil drilling equipment and other products designed and manufactured by VETCO for use in the North Sea. The products sold included pipe and pipe connectors. VETCO designed the pipe connectors, and from 1968 throughout the years at issue, VIAG had them machined from raw forgings by ITAG, an unrelated (within the meaning of section 954(d)(3)(A)) West German company located in Celle, West Germany. ITAG machined the connectors pursuant to its 1968 agreement with VIAG. The raw forging material consisted of a block of steel purchased by ITAG in accordance with VETCO's metallurgical specifica-

tions and standards. The most costly material in the process was the pipe to which the machine connectors were precision welded in accordance with VETCO's specifications.

## VOL

During the years at issue, VOL maintained a facility in Aberdeen, Scotland, near the North Sea oil drilling sites. VOL's facility was capable of providing welding, grinding, beveling, inspection, repair, and storage services. VOL stored VIAG's pipe connectors in its Aberdeen facility. During 1974 and 1975, machine tools were delivered to VOL's Aberdeen plant which gave VOL the capability of machining VETCO-designed connectors from raw forgings. During those years, VOL arranged for VIAG's purchase of machined pipe connectors from ITAG, as well as other materials, which it stored for VIAG. VOL also performed precision welding in assembling the connectors to the pipe. VOL then prepared the pipe assembly for shipment to customers.

In 1975, VOL began machining from raw forgings a limited quantity of VETCO-designed connectors for sale to VIAG. These connectors were placed in VIAG's inventory maintained by VOL in its Aberdeen facility. ITAG also continued to machine connectors for VIAG under the terms of the ITAG agreement.

During the years at issue, VOL, either directly or through its wholly owned subsidiary, VETCO (London), Ltd., arranged for the sale of the pipe assembly to customers for use outside of Switzerland. At all relevant times, title to the materials was held by VIAG, which bore the full risk of loss.

During taxable year 1974 and for the first quarter of 1975, VOL and VIAG utilized Zanora, a Luxembourg corporation, to bill VIAG for fabrication services performed by VOL for VIAG. VOL invoiced Zanora its costs for the fabrication services plus a 5-percent markup. Zanora then invoiced VIAG the amount charged by VOL, without further markup. For financial and tax reporting purposes, petitioner's financial auditors treated VOL, Zanora, and VIAG as related parties. All of VIAG's sales for taxable year 1974 that are at issue involve transactions in which VOL utilized Zanora to rebill VIAG. After the first quarter of taxable year 1975, VOL billed VIAG directly for the fabrication services.

On all VIAG sales during the years at issue involving fabrication services performed by VOL, all pipe connectors (except the SF 341,653.13 in connectors which were purchased by VIAG from VOL and included in VIAG's 1975 cost of sales and reported as subpart F income) were purchased, using a VOL purchasing office, from suppliers in which petitioner and its subsidiary companies had no ownership interest.

VOL, either directly or through Zanora, invoiced VIAG the following amounts for fabrication and related services included in VIAG's cost of sales for the taxable years at issue:

|  | 1974 | 1975 |
|---|---|---|
| VOL-Zanora-VIAG | SF[4] 1,341,727 | SF 115,244 |
| VOL-VIAG | - - - | 3,796,723 |

VIAG billed its customers SF11,553,754 and SF 69,723,770 during taxable years 1974 and 1975, respectively, for items involving VOL's services.

The primary service provided for VIAG by VOL was the welding of VIAG's VETCO-designed connectors to pipe. The process of connecting the machined connectors to the oil pipe purchased from unrelated parties involved both semi-automatic and automatic welding. The following describes the steps in VOL's operations:

1. moving sections of pipe from a storage yard to a rack for placement in proximity to a connector;

2. tack welding the connector to the pipe;

3. rotation of the pipe on a set of rollers for a route pass made by a semi-automatic machine;

4. rolling of the pipe to another station for final welding ("submerged arc");

5. grinding of the weld seam to remove slag and other roughness to improve inspection capability;

6. sometimes inserting a rubber sealing ring ("o ring") in a premachined groove in the connector;

7. welding pad eyes or lift eyes to the pipe to facilitate handling; and

---

[4]The foreign exchange rate between U.S. dollars and Swiss francs for 1974 and 1975 was 1 SF: $.34 and 1 SF: $.39, respectively. Statistical Abstract of the United States 1978, at 927, table No. 1578 (99th ed.)

8. attachment of end protectors to prevent damage during shipment.

VOL also performed repair work on the pipe connectors. This involved cutting off the connectors and rewelding them. An oxyacetylene torch is used in the cutting process to create a beveled angle.

### Respondent's Determination

In his notice of deficiency, respondent determined that petitioner had reportable subpart F income, from VIAG, of $2,325,582 and $14,726,054 for taxable years 1974 and 1975, respectively.

### OPINION

### 1. General Overview of Subpart F

This case involves the provisions of subpart F of the Code (secs. 951-964). Before we address the parties' respective arguments, we find it helpful to first generally review subpart F.

Prior to the Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960, the income of a foreign corporation, even one controlled by a U.S. shareholder, was not subject to U.S. tax on its income earned outside the United States, unless the narrow foreign personal holding company provisions (secs. 551-558) were applicable. This scenario resulted in the use of so-called tax haven countries within which only minimal business operations were carried on in order to insulate income from U.S. tax. A deferral of tax resulted until the income was repatriated because U.S. tax was not imposed until the dividends were paid by the foreign subsidiary and received by the U.S. shareholder. See generally *Estate of Whitlock v. Commissioner*, 59 T.C. 490 (1972), affd. in part and revd. in part on other grounds 494 F.2d 1297 (10th Cir. 1974); *Dave Fischbein Manufacturing Co. v. Commissioner*, 59 T.C. 338 (1972); 2 J. Isenbergh, International Taxation: U.S. Taxation of Foreign Taxpayers and Foreign Income, sec. 25.1 (1990).

Congress limited this tax deferral privilege with the enactment of the Revenue Act of 1962, which added subpart F. Under the statutory scheme, U.S. shareholders

of a controlled foreign corporation (CFC) must generally include their pro rata share of the CFC's "subpart F income." Sec. 954(a)(1). Section 952(a)(2) defines subpart F income as including "foreign base company income" as determined under section 954. Under the provisions of section 954(a)(2), foreign base company income includes "foreign base company sales income" as determined under section 954(d).

Section 954(d)(1) generally defines foreign base company sales income as income (profits, commissions, fees, etc.) derived in connection with either:

(a) the purchase of personal property from a related person and its sale to any person;

(b) the sale of personal property to any person on behalf of a related person;

(c) the purchase of personal property from any person and its sale to a related person; or

(d) the purchase of personal property from any person on behalf of a related person.

Section 954(d)(1), in relevant part, further requires that the subject property be manufactured or produced outside the country in which the CFC is organized, and that the subject property be sold for use outside that country. Under the provisions of section 954(d)(3)(A), "related person" includes a wholly owned subsidiary of a CFC.

Foreign base company sales income is also generated under the so-called "branch rule" of section 954(d)(2). Under that section, where the carrying on of activities by the CFC through a "branch or similar establishment" (hereinafter referred to as branch) outside the CFC's country of incorporation has substantially the same effect as if the branch or similar establishment were a wholly owned subsidiary corporation, then the income attributable to the carrying on of such activities shall be treated as income derived by a wholly owned subsidiary of the CFC and shall constitute foreign base company sales income of the CFC.

## 2. Whether the ITAG-VIAG Transactions Are at Issue

It is not disputed that VIAG is a CFC within the meaning of section 957(a). The parties have limited the question for trial to whether VIAG's income for the years at issue was foreign base company sales income under the branch rule of section 954(d)(2). Respondent contends that the branch rule was triggered both by VIAG's transactions with ITAG, the unrelated German manufacturer, and VIAG's transactions with VOL, its wholly owned subsidiary.

As a preliminary matter, we address whether the ITAG issue was properly before us. At trial, petitioner objected to respondent's raising the issue of whether ITAG was a branch of VIAG. Petitioner asserts that the only issues for trial related to whether VOL was a branch of VIAG, and if so, whether VOL's processing of the connectors and pipe constituted manufacturing. Petitioner argues that it settled the issue of whether ITAG was a branch prior to respondent's issuance of the notice of deficiency, and thus the issue was not included in the notice of deficiency. Moreover, petitioner argues that respondent's raising it at the commencement of the trial unfairly prejudices petitioner. In support thereof, petitioner asserts that it prepared for trial on the basis of the issues stated by respondent in his trial memorandum, namely whether VOL was a branch.

This controversy originated with respondent's trial memorandum, in which he stated that the issues for trial were:

I. Whether the "Branch Rule" set forth in I.R.C. Sec. 954(d)(2) applies to VOL?

II. If the "Branch Rule" does apply, whether VOL's activity constitutes manufacturing?

Respondent further stated in a footnote that:

A sub-issue to be argued on brief is whether or not an unrelated corporation which machined connectors to petitioner's specifications pursuant to a contract between VIAG and the unrelated corporation constituted another branch operation which would require petitioner to fall under the ambit of Subpart F. * * * Respondent's analysis on this point will conform to the analysis set forth in Rev. Rul. 75-7, 1975-1 C.B. 244.

At trial when the Court questioned respondent about the status of the ITAG-VIAG issue, he conceded that the transactions between ITAG and VIAG were not set out in the statutory notice of deficiency, but rather were only included in the supporting calculations because of the over-70-percent computation required by section 954(b)(3)(B).[5]

That the ITAG transactions were not set out in the statutory notice is borne out by the notice itself, in which the subpart F income determined for the years at issue was derived from a worksheet column titled "UNAGREED W/O ITAG." Respondent also stated that there were transactions between ITAG and VOL that should be considered in deciding the applicability of the branch rule. In sum, respondent argues that there are sufficient stipulated facts for us to address the ITAG transactions and that the statutory notice was broad enough to encompass his position.

We must first decide whether respondent's assertion of the ITAG transaction constitutes a new matter or is merely the assertion of a new theory which clarifies or develops his original determination. Respondent has introduced a new matter if his assertion either alters the original deficiency or requires the presentation of different evidence. See *Achiro v. Commissioner,* 77 T.C. 881, 890 (1981); *Estate of Falese v. Commissioner,* 58 T.C. 895, 898-899 (1972); *McSpadden v. Commissioner,* 50 T.C. 478, 492-493 (1968); *Papineau v. Commissioner,* 28 T.C. 54, 57 (1957); *Tauber v. Commissioner,* 24 T.C. 179, 185 (1955).

Although respondent's assertion regarding ITAG does not alter the original deficiency, it does require the presentation of different evidence. The issue of whether VOL is a branch of VIAG focuses largely on the corporate structure of petitioner as well as VOL's activities. Our consideration of whether ITAG is a branch of VIAG would require facts

---

[5]Respondent: That issue, for 1974, the adjustment, the amount of money that's in that adjustment between ITAG and VIAG was not set out in the Statutory Notice.

It is also not set out separately in the Statutory Notice for 1975, however, the adjustment is included in the Statute [sic], computation of a deficiency for 1975, because if the Government prevails with regard to the transactions which occurred between VIAG Switzerland, and VOL Scotland, the Subpart (f) income computation exceeds 70 percent, and, as such, all of the income of the Swiss company, controlled foreign corporation, is taxable.

So, the issue is: Is it in the Statutory Notice for '74? No.

Is it in the Statutory Notice of '75? Yes; but it is in the Statutory Notice for '75 because of a Statutory computation.

focusing on ITAG's structure and activities. See *Ashland Oil, Inc. v. Commissioner,* 95 T.C. 348 (1990) (addressing issue of whether an unrelated manufacturer is a branch). Moreover, respondent's position vitiates the purpose of our pretrial rules. See Rule 31(a). Accordingly, we hold that the ITAG issue, which by respondent's own admission was not included in the 1974 notice of deficiency and was included only as a computational adjustment in the 1975 notice, is a new issue.

Respondent did not amend his answer to raise the issue of the ITAG-VIAG transactions, nor the purported ITAG-VOL transactions. Nevertheless, respondent devotes a significant portion of his brief to arguing that ITAG was a branch of VIAG.

Respondent had sufficient opportunity prior to trial to amend his answer to assert the ITAG issue and give petitioner ample notice to prepare its case accordingly. Respondent's footnote in his trial memorandum was not a proper amended pleading. We will not consider this issue which was raised for the first time at trial. See *508 Clinton Street Corp. v. Commissioner,* 89 T.C. 352, 353 n. 2 (1987); *Estate of Mandels v. Commissioner,* 64 T.C. 61, 73 (1975). Accordingly, we need not consider petitioner's alternate contention that the ITAG issue was settled.

*3. Whether VIAG's Wholly Owned Subsidiary, VOL, Is a Branch Under Section 954(d)(2)*

We next address the controlling issue of whether a CFC's (VIAG's) wholly owned subsidiary (VOL) can be a branch within the meaning of section 954(d)(2). (Respondent did not argue that section 954(d)(1) by itself applied (see *infra* note 7), and we leave the question of that section's applicability to another day.) Petitioner argues that as a matter of law a wholly owned subsidiary cannot be a branch. Petitioner relies on the ordering and structure of section 954(d), as well as its underlying legislative history. Respondent contends that Congress intended the section 954(d)(2) branch rule as a loophole-closing provision to prevent the use of multiple foreign countries for tax avoidance. Respondent also points to the legislative history in support of his

position. For the reasons set forth below, we agree with petitioner.

At the outset we note that neither the Code, the legislative history of subpart F, nor the regulations define branch for purposes of section 954(d)(2). Cf. sec. 1.963-1(f)(4)(i), Income Tax Regs. (defining a branch for purposes of sec. 963, as then in effect).[6]

We begin by examining the structure of section 954(d)(1),[7] which defines foreign base company sales income (FBCSI). Section 954(d)(1) sets forth the general rule defining FBCSI. In so doing, the first flush paragraph of section 954(d)(1) describes certain triggering transactions between or on behalf of related persons that result in FBCSI. Section 954(d)(3)[8] defines related person for purposes of section 954(d). Related is defined, in relevant part, in terms of control, which means the ownership, directly or indirectly, of stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote. Therefore, a wholly owned subsidiary is a related person with respect to its CFC parent. Sec. 954(d)(3)(A).

In addition, section 954(d)(2) provides for the branch rule, the application of which is the issue before us:

---

[6]Sec. 963 was repealed for taxable years of foreign corporations beginning after Dec. 31, 1975, and for taxable years of U.S. shareholders within which or with which such taxable years of such foreign corporations end. Tax Reduction Act of 1975, Pub. L. 94-12, sec. 602(a), 89 Stat. 26.

[7]SEC. 954(d). FOREIGN BASE COMPANY SALES INCOME.—

(1) IN GENERAL.— For purposes of subsection (a)(2), the term "foreign base company sales income" means income (whether in the form of profits, commissions, fees, or otherwise) derived in connection with the purchase of personal property from a related person and its sale to any person, the sale of personal property to any person on behalf of a related person, the purchase of personal property from any person and its sale to a related person, or the purchase of personal property from any person on behalf of a related person where—

(A) the property which is purchased (or in the case of property sold on behalf of a related person, the property which is sold) is manufactured, produced, grown, or extracted outside the country under the laws of which the controlled foreign corporation is created or organized, and

(B) the property is sold for use, consumption, or disposition outside such foreign country, or, in the case of property purchased on behalf of a related person, is purchased for use, consumption, or disposition outside such foreign country.

[8](3) RELATED PERSON DEFINED.—For purposes of this section, a person is a related person with respect to a controlled foreign corporation, if—

(A) such person is an individual, partnership, trust, or estate which controls the controlled foreign corporation;

(B) such person is a corporation which controls, or is controlled by, the controlled corporation; or

(C) such person is a corporation which is controlled by the same person or persons which control the controlled foreign corporation.

(2) CERTAIN BRANCH INCOME.—For purposes of determining foreign base company sales income in situations in which the carrying on of activities by a controlled foreign corporation through a branch or similar establishment outside the country of incorporation of the controlled foreign corporation has substantially the same effect as if such branch or similar establishment were a wholly owned subsidiary corporation deriving such income, under regulations prescribed by the Secretary or his delegate the income attributable to the carrying on of such activities of such branch or similar establishment shall be treated as income derived by a wholly owned subsidiary of the controlled foreign corporation and shall constitute foreign base company sales income of the controlled foreign corporation.

Petitioner contends that a branch is not one of the entities described in section 954(d)(3); thus, the purpose of the branch rule is to provide the necessary relationship, i.e., by treating the branch as a wholly owned subsidiary and bringing any triggering transactions within the scope of section 954(d)(1). Accordingly, transactions between a CFC parent and its wholly owned subsidiary should be solely within section 954(d)(1), which is not at issue in this case, without any application of the branch rule. Petitioner further argues that subpart F generally, and the section 954(d)(2) branch rule specifically, should be construed narrowly because they were intended to tax only the specified transactions.

Respondent, on the other hand, argues that although VOL was in substance a subsidiary of VIAG, it was really no different than a branch within the meaning of section 954(d)(2). In support thereof, respondent contends that VOL was functioning as a contractual manufacturer for VIAG. Respondent also argues that VOL was economically captive to VIAG because it derived such a large portion of its revenues from VIAG. In sum, respondent contends that petitioner used VIAG and VOL to avoid U.S. tax by splitting their sales and manufacturing operations in order to take advantage of Switzerland's lower tax rate. In his brief, respondent urges us to look past petitioner's "contractual wizardry" and apply the branch rule as a loophole-closing device to circumvent petitioner's attempted tax avoidance.

Our examination of the structure of section 954(d), as well as its underlying legislative history, leads us to agree with petitioner that the branch rule simply supplies the relation-

ship required to bring an otherwise unrelated party within the spectrum of section 954(d)(1). We start with the " 'elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute.' A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error." 2A Sutherland Statutory Construction sec. 46.06 (1986) (citations omitted). Under respondent's theory, section 954(d)(2) would result in the following circular syllogism: if a wholly owned subsidiary of a CFC is a branch, then its income will be treated as income derived by a wholly owned subsidiary of the CFC.

Moreover, respondent's interpretation would render section 954(d)(1) superfluous in part because wholly owned subsidiaries would, in effect, be covered by both section 954(d)(1) and section 954(d)(2). There is no indication that Congress intended such an overlap or backstop. Cf. sec. 465(b)(4). To the contrary, the Senate report that introduced the branch rule illustrates that the term branch should be distinguished from a wholly owned subsidiary:

> Also included in foreign base company sales income are operations handled through a branch (*rather than a corporate subsidiary*) operating outside of the country in which the controlled foreign corporation is incorporated, if the combined effect of the tax treatment accorded the branch, by the country of incorporation of the controlled foreign corporation and the country of operation of the branch, is to treat the branch substantially the same as if it were a subsidiary corporation organized in the country in which it carries on its trade or business. [S. Rept. 1881, 87th Cong., 2d Sess. 84 (1962), 1962-3 C.B. 707, 790. Emphasis added.]

One commentator observed the following regarding the rationale underlying the branch rule:

> During the study of the 1962 Act by the Senate Finance Committee, it became apparent that, under the laws of many European countries, *separate sales subsidiaries were not necessary in order to separate the taxation of manufacturing and selling activities.* Under the laws of these European countries, the same tax result can be achieved by conducting one or the other of such activities through a permanent establishment located in a separate foreign country from the country in which the corporation in question was incorporated. For example, a Swiss corpora-

tion which is in the business of selling products manufactured through a permanent establishment located in Belgium will not be subject to tax by Belgium but will pay only Swiss tax on its sales income; at the same time, the Belgian branch pays only Belgian tax on the manufacturing profit. In other words, essentially the same overall tax result is achieved if the Belgian branch were a separate subsidiary of the Swiss corporation. [Fimberg, "The Foreign Base Company Engaged in Selling Activities: A Reappraisal of the Conduct of Foreign Business," 17 Univ. of So. Cal. Tax Institute 237, 260-261 (1965). Emphasis added; fn. ref. omitted.]

Therefore, branches or similar establishments could be established in a foreign country without the stock ownership required of a separately incorporated subsidiary. Accordingly, the branch rule was intended to prevent CFC's from avoiding section 954(d)(1) because there would be no transaction with a related person within the meaning of section 954(d)(3).

We also reject respondent's assertion that the branch rule was intended as a broad loophole-closing device to prevent the use of multiple foreign countries to take advantage of lower tax rates in those countries. Respondent, in effect, repeats his argument from *Ashland Oil, Inc. v. Commissioner, supra,* where he unsuccessfully attempted to use the tax rate disparity test, found in section 1.954-3(b)(1)(i)(b) and 1.954-3(b)(1)(ii)(b), Income Tax Regs., to define a branch.

Moreover, respondent's argument ignores the legislative history of subpart F and the branch rule, which suggest a narrower view. The tax revision proposal sent by President Kennedy to Congress in 1961 did call for taxing corporations on their current share of undistributed profits realized by subsidiary corporations organized in economically advanced countries. However, after lengthy hearings that reflected concern that the President's proposals went too far and might disadvantage U.S. firms operating abroad, Congress narrowed the scope of the proposed legislation that eventually became the Revenue Act of 1962 to curb tax haven devices rather than eliminating tax deferral for American-owned operating businesses located in the economically developed countries of the world. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 461-462; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 785; *Ashland Oil, Inc. v. Commissioner, supra; Estate of Whitlock v. Commissioner,* 59 T.C. at 500-501. Thus,

although Congress was concerned with tax havens, the resulting legislation did not contain the broad language necessary to support respondent's position. Compare sec. 482; sec. 446(b); sec. 269(a).

Because we hold that VOL is not a branch of VIAG within the meaning of section 954(d)(2), we do not address whether VOL was engaged in manufacturing.

In light of the foregoing,

*Decision will be entered for the petitioner.*