T.C. Memo. 1997-492


UNITED STATES TAX COURT


DONALD R. MARTIN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 19374-94.                    Filed October 29, 1997.


Donald R. Martin, pro se.

<u>Julie M.T. Foster</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, <u>Judge</u>:  Respondent determined that petitioner is liable for income tax deficiencies and additions to tax as follows:

|       |            | Additions to tax |
| Year  | Deficiency | Sec. 6651(a)(1)  |
| ----- | ---------- | ---------------- |
| 1990  | $92,776    | $21,479          |
| 1991  | 41,922     | --               |

Petitioner caused The Activewear Company, Inc. (Activewear), a corporation of which he was a 50-percent shareholder, to lend money to an unrelated party, Randy Jackson (Jackson), to use in Jackson's businesses. Jackson did not fully repay the loans. The issues for decision are:

1. Whether the amounts Activewear lent, less the amounts Jackson repaid (a net of $318,000 for 1990 and $126,094 for 1991), were taxable to petitioner as constructive dividends from Activewear. We hold that they were not.

2. Whether the value of property Jackson provided to petitioner as security was income to petitioner in 1990 and 1991. We hold that it was not.

3. Whether petitioner is liable for an addition to tax under section 6651(a)(1) for late filing of his 1990 Federal income tax return. We hold that he is.

Section references are to the Internal Revenue Code in effect in the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts are stipulated and are so found.

A. <u>Petitioner</u>

Petitioner lived in Athens, Georgia, when he filed the petition in this case.

B.   Activewear

Petitioner met J. Douglas Waddell (Waddell) in 1976 when they worked together at a sewing plant in Athens, Georgia. Around 1984, petitioner asked Waddell to join him in starting a sewing business.  Waddell agreed.

Petitioner and Waddell formed a sewing business called Activewear in 1985.  Petitioner and Waddell each owned 50 percent of Activewear.  Activewear manufactured pants, skirts, and shorts.  Petitioner was Activewear's secretary/treasurer and was primarily responsible for its financial and business activities. Petitioner wrote most of the checks from the Activewear account from 1985 to 1991.  He also handled most of the correspondence for Activewear.  Waddell was Activewear's president and was primarily responsible for personnel and production.  Petitioner and Waddell received equal salaries and bonuses.  Waddell could use the checkbook and inspect the accounting records at anytime. He occasionally wrote Activewear checks when petitioner was not available.

For the first 5 or 6 years Activewear was in business, petitioner and Waddell each had salaries of more than $100,000 per year.  In 1990 and 1991, Activewear was financially successful.

C.   Jackson

Jackson had been petitioner's friend since petitioner attended college.  Waddell did not know Jackson.

In 1985, Jackson gave Activewear a short-term loan to help it meet its payroll.  Activewear repaid the loan.  Jackson continued to make short-term loans whenever Activewear had a cash-flow problem.  Activewear always repaid those loans.

In the years in issue, Jackson owned Greensboro Ford and Carey Station, Inc. (Jackson's corporations).  Jackson's wife was the majority shareholder in a campground in Tallulah Falls, Georgia.

D.   Activewear's Loans to Jackson's Corporations

1.   Initial $50,000 Loan

Around November 1989, Jackson's corporations began to have cash-flow difficulties.  Jackson asked petitioner for a short-term loan.  Jackson offered to repay the loan in a week, to pay 10-percent interest, and to provide three classic automobiles as collateral.  Petitioner believed Jackson was a good credit risk. Activewear had funds available to make the loan.  Petitioner asked Waddell to authorize Activewear to lend $50,000 to Jackson's corporations.  Waddell approved the loan.  Activewear then lent Jackson's corporations $50,000 based on an oral

agreement.  Jackson repaid the $50,000 loan on time and paid Activewear 10-percent interest on the loan.

   2.   Additional Loans

Activewear then made more short-term loans to Jackson's corporations.  Petitioner wrote checks payable to Jackson or his corporations drawn on Activewear's account.  Jackson or his corporations repaid the loans to Activewear, usually in less than 4 days with interest at 10 percent.  Petitioner did not discuss the loans to Jackson with Waddell after the first $50,000 loan.  Petitioner wrote the checks to Jackson on the Activewear checking account and properly recorded each loan in Activewear's account books.  There were no written loan agreements.

Petitioner also personally lent $100,000 to Jackson at a time not specified in the record.  Petitioner borrowed that money from a retired friend, Norman Hardin (Hardin).  Hardin knew that petitioner was going to lend the money to Jackson.  As security for that loan, in February 1991, Jackson gave petitioner a fourth or fifth mortgage to a restaurant building.  A neon light caused a fire in the restaurant at a date not specified in the record.

In 1989 or 1990, Jackson gave petitioner two blank promissory notes that he had signed as security for the loans Activewear and petitioner made to him or his corporations.  One note was for Activewear's loans to Jackson and the other note was

for petitioner's personal loan to Jackson.  These notes were to be completed by petitioner or Activewear if Jackson or his corporations did not repay the loans.

Petitioner recorded all of the loans in Activewear's books. Petitioner wrote a check for every loan and completed the check stub in the Activewear checkbook.  Activewear made short-term loans to Jackson until May 1991.

3.   Jackson's Repayment History

Jackson timely repaid all of the Activewear loans for 2½ years until about August 1990.  At that time, his repayments began to be late and some of his checks bounced.

In 1990, Activewear lent $2,070,900 to Jackson's corporations and Jackson's corporations repaid $1,752,900. Activewear continued to lend money to Jackson because petitioner believed that Jackson would be able to repay the loans if he could continue to operate.  In 1991, petitioner lent $958,880 to Jackson's corporations and Jackson's corporations repaid $832,786.06.  Jackson's outstanding loan balances were $318,000 for 1990 and $126,094 for 1991.

E.    Petitioner's Loans from Trust Co.

    1.    Loans to Petitioner

In 1990, petitioner borrowed $15,000 from Trust Co. Bank of Northeast Georgia (Trust Co.) to increase the inventory in a convenience store that he owned.

Activewear began to have cash-flow problems around April 1991, in part because Jackson and his corporations had not repaid the loans to Activewear.  Petitioner asked Trust Co. to lend money to petitioner for Activewear to use as operating capital. Trust Co. agreed to lend $50,000 to petitioner in April 1991 and $15,000 in July 1991.  Thus, at that time, petitioner had loans totaling $80,000 from Trust Co.  The $50,000 and $15,000 loans were the personal liability of petitioner.  Petitioner immediately transferred the proceeds of these loans to Activewear.  Petitioner recorded these amounts on Activewear's books as loan repayments by Jackson.

    2.    Collateral for Loans

In October 1991, when the $50,000 and $15,000 April and July 1991 loans were due, Tom Wilson, vice president of Trust Co., asked petitioner to consolidate them with his earlier $15,000 loan, and to provide collateral for the $80,000 consolidated loan.  Petitioner gave Trust Co. collateral consisting of his own stock, mutual funds, and other marketable securities with a market value of $27,291 and an $80,000 second mortgage to his

personal residence with the understanding that, if other security interests provided by Jackson (described next) had sufficient value, Trust Co. would return petitioner's property. Petitioner had about $100,000 in equity in his home at the time.

Petitioner asked Jackson to provide collateral for the consolidated loan. Jackson owned a house financed by a first mortgage from First Federal in Winder, Georgia. The first mortgage was $202,000. Jackson sold the house to Ken and Victoria O'Key (the O'Keys) and took back a second mortgage. The O'Keys agreed to pay Jackson, who would then make payments to First Federal on the first mortgage and keep the payments on the second mortgage. Jackson assigned the second mortgage to petitioner which petitioner gave to Trust Co. Jackson also gave petitioner the following security interests which petitioner gave to Trust Co.: (a) A second deed from Neighbors Group, Inc., for seven tracts of land in Deer Lake Estates; and (b) a second deed to secure debt (not otherwise described in the record) on a small strip shopping mall in Statham, Georgia. Petitioner also gave Trust Co. the fourth or fifth mortgage on the restaurant building that Jackson had given petitioner in February 1991.

None of the security interests were in foreclosure when they were assigned to petitioner. Petitioner used them as collateral for the $80,000 consolidated loan he made in October 1991.

All security interests Jackson gave to petitioner were signed over to petitioner, not Activewear. Petitioner gave the security interests to Trust Co. when he received them from Jackson, except for the one for the restaurant building which he gave to Trust Co. later.

Petitioner was personally liable for these bank loans.

F. Civil Lawsuit Against Petitioner

In early 1991, Greg Garcia (Garcia), Activewear's tax attorney, told Waddell that petitioner was lending Activewear's money to Jackson and that Jackson usually repaid it in 2 to 4 days. Garcia told Waddell that Garcia would tell Waddell if repaying the loans ever became a problem.

Around April 1991, Trust Co. told Waddell that Jackson had insufficient funds for two checks. Early in 1992, Trust Co. told Waddell that more than $200,000 had been taken from Activewear. Garcia advised Waddell to retain a lawyer, and referred him to one. Waddell did not ask petitioner for an explanation. Instead, he hired a lawyer. At that time, Waddell believed that petitioner had embezzled money from Activewear. In 1992, Waddell sued petitioner in the Superior Court of Athens-Clarke County, Georgia, on behalf of himself and Activewear to recover the amounts Jackson had not repaid. In the same lawsuit, petitioner sued Jackson's corporations to recover the amounts Jackson had not repaid. Waddell deposed all parties and investigated the case thoroughly.

The parties settled the lawsuit without trial on May 24, 1993. Petitioner agreed to pay $155,000. He borrowed money to make this payment, and gave his house and securities as collateral.

Petitioner was never criminally charged for any conduct relating to Activewear.

G.    Petitioner's Use of the O'Key Property in 1993-94

In 1992, Jackson filed for bankruptcy protection under Chapter 11. The O'Keys stopped paying Jackson. Petitioner told the O'Keys that they must make all the payments that were due or move out. In August 1993, they moved out and petitioner moved in. He lived there rent-free until August 1994 when Jackson's bankruptcy proceedings ended and the bank foreclosed on the house. The Resolution Trust Corp. sold the house at auction for $152,000.

H.    Petitioner's Income Tax Returns and Respondent's
      Determination

Petitioner received an extension of time to file his 1990 income tax return until October 15, 1991. Petitioner filed his income tax returns for 1990 and 1991 on August 26, 1992. He filed married filing separately.

On his income tax return for 1990, petitioner attached a disclosure statement which said:

> 2.    The taxpayer made unauthorized loans from
> Activewear corporate funds in the amount of $2,070,900,
> less repayments of $1,752,900 = $318,000 balance due.
> The corporation is pursuing the taxpayer with charges

of embezzlement. The taxpayer's assertion is that the loan amounts outstanding are due to the corporation and not to him personally and therefore is not including the balance due of $318,000 in his taxable income.

On his income tax return for 1991, petitioner attached a disclosure statement which said:

2. The taxpayer made unauthorized loans from Activewear, Inc. in the amount of $958,880 less repayments of $832,786 = $126,094 balance due. The corporation is pursuing the taxpayer with charges of embezzlement. The taxpayer's assertion is that the loan amounts outstanding are due to the corporation and not to him personally and therefore he is not including the balance due of $126,094 in taxable income.

Respondent determined that the $318,000 in 1990 and $126,094 in 1991 was income to petitioner. Respondent also determined that petitioner filed his 1990 income tax return late.

OPINION

A. Positions of the Parties

Respondent contends that petitioner misappropriated funds by writing unauthorized checks from Activewear to Jackson's corporations in 1990 and 1991. Alternatively, respondent contends that the unpaid balances were constructive dividends paid by Activewear to petitioner. Thus, respondent contends that the unpaid loan balances of $318,000 in 1990 and $126,094 in 1991 to Jackson's corporations are income to petitioner. Respondent also contends that the security interests Jackson gave to petitioner for the Activewear loans were income to petitioner.

Petitioner contends that the unpaid amounts were not income to him because the transfers were bona fide business loans from

Activewear to Jackson.  Petitioner also contends that the security interests are not taxable to him because he received no benefit from them in the years in issue.  For reasons discussed next, we agree with petitioner.

B.    Whether Petitioner Misappropriated Funds From Activewear

Respondent contends that petitioner misappropriated the funds Activewear lent to Jackson and his corporations.  We disagree.  When he filed his lawsuit, Waddell thought that petitioner had embezzled money from Activewear.  However, after he investigated the matter, he believed that petitioner did not benefit from the loans to Jackson.  Petitioner had no reason to believe that Waddell would not approve the advances because Waddell had approved the first one, and he did nothing to conceal the loan records from Waddell.  Petitioner credibly testified that he received no benefit from Activewear's loans to Jackson.  Petitioner was not criminally charged for his conduct related to Activewear.  We do not believe that he misappropriated any funds from Activewear.

Respondent contends that the transfers of funds from Activewear to Jackson's corporations were not loans because there were no written agreements and Jackson provided no collateral or other security.  We disagree.  Respondent concedes that the first $50,000 check was a loan even though it was based on an oral agreement.  The later transfers were also loans based on oral agreements.

C.    Whether the Unpaid Balances of the Loans From Activewear to
      Jackson's Corporations Are Constructive Dividends to
      Petitioner

Respondent contends that the unpaid balances of Activewear's advances to Jackson or his corporations were constructive dividends to petitioner.  We disagree.

Gross income includes dividends.  Sec. 61(a)(7).  A dividend is a distribution of property by a corporation to its shareholders from its earnings and profits.  Sec. 316(a).  A shareholder receives a constructive dividend to the extent of the corporation's earnings and profits if the corporation pays a personal expense of its shareholder or the shareholder uses corporate property for a personal purpose.  Secs. 301, 316; Falsetti v. Commissioner, 85 T.C. 332, 356-357 (1985); Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 743-744 (1973).  Whether a shareholder receives a constructive dividend is a question of fact.  Hagaman v. Commissioner, 958 F.2d 684, 690-691 (6th Cir. 1992), affg. and remanding T.C. Memo. 1990-655; Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214-1215 (5th Cir. 1978).

Petitioner did not use or receive any benefit from the unpaid balance of Activewear's loans to Jackson or his corporations.  Petitioner used his own funds to compensate for Jackson's failure to repay Activewear.  Petitioner reasonably believed that it was in Activewear's interest to help Jackson and to earn interest for Activewear.

Respondent relies on Crowley v. Commissioner, 962 F.2d 1077 (1st Cir. 1992), affg. T.C. Memo. 1990-636, for the proposition that the unpaid funds transferred from Activewear to Jackson were constructive dividends to petitioner. We disagree. In Crowley v. Commissioner, supra at 1078-1079, the taxpayer used corporate funds; here, petitioner did not use the unpaid loan balances. The taxpayer in Crowley did not intend to repay the funds at issue, id. at 1081; here, petitioner and Activewear expected Jackson to repay the loans.

Respondent contends that the facts in this case differ from those in Gilbert v. Commissioner, 552 F.2d 478 (2d Cir. 1977), revg. T.C. Memo. 1976-104, in which we held that corporate payments were not constructive dividends. We disagree. The facts are stronger for petitioner in this case than they were for the taxpayer in Gilbert. The taxpayer in Gilbert v. Commissioner, supra at 479, 481, withdrew funds from a corporation which he intended and expected to repay. He used funds in part to benefit the corporation. Id. at 481. The U.S. Court of Appeals for the Second Circuit held that the withdrawals were not income to the taxpayer. Here, petitioner did not personally withdraw funds or use them for his own benefit. Petitioner reasonably believed that Jackson would repay Activewear.

Respondent contends that Activewear's transfers to Jackson were personal because Activewear was not in the lending business. We disagree. Respondent cites no authority for this contention.

We conclude that the amounts that Jackson owed to Activewear in 1990 and 1991 were not constructive dividends to petitioner.

D. <u>Whether Petitioner Received Income From Security Interests Provided by Jackson</u>

Jackson assigned four security interests to petitioner and petitioner used the four security interests to secure an $80,000 personal loan. Respondent contends in respondent's pretrial memorandum, opening statement, and posttrial brief that petitioner received $402,600 in income from the four security interests. We disagree.

Respondent did not raise the theory that petitioner received income from the security interests in the notice of deficiency. A theory not raised in the notice of deficiency is new matter if it increases the original deficiency or requires the taxpayer to present different evidence. Rule 142(a); <u>Vetco, Inc. v. Commissioner</u>, 95 T.C. 579, 588 (1990); <u>Achiro v. Commissioner</u>, 77 T.C. 881, 890 (1981); <u>Estate of Falese v. Commissioner</u>, 58 T.C. 895, 898-899 (1972). To contest this theory, petitioner would have needed to introduce evidence relating to his consolidated loan from Trust Co. and the four security interests. The four security interests were not collateral for Activewear's loans to Jackson. Petitioner was not required to offer that evidence to

defend against respondent's determination in the notice of deficiency that the unpaid balances in 1990 and 1991 were misappropriations and income to petitioner. Respondent bears the burden of proof. Rule 142(a).

The four security interests were not collateral for the Activewear loans to Jackson and his corporations; they secured petitioner's consolidated $80,000 personal loan, $65,000 of which petitioner used to provide operating capital for Activewear. Thus, petitioner used the loan proceeds primarily for Activewear. Petitioner used about $27,000 of his marketable securities and a house with about $100,000 in equity as collateral for the consolidated loan. This is more than enough collateral for the $15,000 loan that petitioner used for inventory for his convenience store that was part of the $80,000 consolidated loan.

Respondent points out that petitioner benefited from living in the O'Key house for 1 year rent-free. That year was August 1993 to August 1994. The years in issue are 1990 and 1991. Respondent has not shown how living in the house in 1993 and 1994 had value in the years in issue. Also, respondent did not prove the value of the benefit petitioner received.

We conclude that respondent has not shown that petitioner received any income from security interests in 1990 or 1991.

E.    Whether Petitioner Is Liable for the Addition to Tax for Failure to Timely File His 1990 Return

Respondent determined that petitioner is liable for the addition to tax for failure to timely file his income tax return for 1990.  Sec. 6651(a).

Section 6651(a)(1) imposes an addition to tax of up to 25 percent of the tax required to be shown on the return for failure to timely file Federal income tax returns unless the taxpayer shows that the failure was due to reasonable cause and not willful neglect.  United States v. Boyle, 469 U.S. 241, 245 (1985); Baldwin v. Commissioner, 84 T.C. 859, 870 (1985); Davis v. Commissioner, 81 T.C. 806, 820 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985).

To prove reasonable cause, a taxpayer must show that he or she exercised ordinary business care and prudence and nevertheless could not file the return when due.  Crocker v. Commissioner, 92 T.C. 899, 913 (1989); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

A taxpayer's disability or mental incapacity may be reasonable cause for failure to file returns, United States v. Boyle, supra at 248 n.6, but selective inability to perform tax obligations does not excuse failure to file.  Kemmerer v. Commissioner, T.C. Memo. 1993-394; Bear v. Commissioner, T.C. Memo. 1992-690, affd. without published opinion 19 F.3d 26 (9th Cir. 1994); Bloch v. Commissioner, T.C. Memo. 1992-1.

Petitioner filed his 1990 return about 10 months late. Petitioner testified that he had problems with Waddell's lawsuit, his own divorce, and alcoholism. However, he did not allege or show that he was incapacitated or unable to file his 1990 return by October 15, 1991, as extended. Petitioner suggests no other reason for filing his 1990 return late. We sustain respondent's determination that petitioner is liable for the addition to tax for failure to timely file his return under section 6651(a) for 1990.

To reflect the foregoing,

Decision will be entered under Rule 155.