RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0280p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

WHIRLPOOL FINANCIAL CORPORATION; CONSOLIDATED
SUBSIDIARIES,

*Petitioners-Appellants*,

v.

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee*.

Nos. 20-1899/1900

On Appeal from the United States Tax Court;
No. 13986-17—Albert G. Lauber, Judge.

Argued: June 9, 2021

Decided and Filed: December 6, 2021

Before: NORRIS, KETHLEDGE, and NALBANDIAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Gregory G. Garre, LATHAM & WATKINS LLP, Washington, D.C., for
Appellants. Judith A. Hagley, UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Appellee. **ON BRIEF:** Mark A. Oates, Robert H. Albaral, A. Duane Webber,
Summer M. Austin, Joseph B. Judkins, Meerah Kim, Cameron C. Reilly, BAKER &
MCKENZIE LLP, Chicago, Illinois, Rodney H. Standage, WHIRLPOOL CORPORATION,
Chicago, Illinois, for Appellants. Judith A. Hagley, Francesca Ugolini, Arthur T. Catterall,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

KETHLEDGE, J., delivered the opinion of the court in which NORRIS, J., joined.
NALBANDIAN, J. (pp. 17–29), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

KETHLEDGE, Circuit Judge.  A subsidiary of Whirlpool Corporation with a single part-time employee in Luxembourg sold refrigerators and washing machines to Whirlpool in a series of complicated transactions.  By means of a 2007 corporate restructuring, neither the Luxembourgian subsidiary nor Whirlpool itself paid any taxes on the profits (more than $45 million) earned from those transactions.  The IRS later determined that Whirlpool should have paid taxes on those profits.  Whirlpool appealed that determination to the Tax Court, which granted summary judgment to the Commissioner.  We affirm.

I.

A.

Before 1962, the income of a foreign subsidiary of an American corporation generally was not subject to taxation in the United States until that income was distributed to the American parent.  *See Ashland Oil, Inc. v. Comm'r of Internal Revenue*, 95 T.C. 348, 354 (1990).  This regime encouraged American companies to structure their operations so as to shift their income to foreign subsidiaries, whose income would not be subject to taxation in the United States.  The American parent could thereby defer indefinitely any taxation in the United States of the income shifted to the foreign subsidiary.

By 1961, the practice of shifting income to foreign subsidiaries for purposes of tax deferral had become widespread among multinational corporations. That year President Kennedy described the problem as follows:

> The undesirability of continuing deferral is underscored where deferral has served as a shelter for tax escape through the unjustifiable use of tax havens such as Switzerland.  Recently more and more enterprises organized abroad by American firms have arranged their corporate structures—aided by artificial arrangements between parent and subsidiary regarding intercompany pricing, the transfer of patent licensing rights, the shifting of management fees, and similar practices which maximize the accumulation of profits in the tax haven—so as to exploit the

multiplicity of foreign tax systems and international agreements in order to reduce sharply or eliminate completely their tax liabilities both at home and abroad.

Message from the President of the United States Relative To Our Federal Tax System, April 20, 1961, *reprinted in* H.R. Doc. No. 87-140, at 6 (1961).

As an example of this practice, suppose that, in 1961, an American company created a subsidiary in a foreign country—say, Mexico—which then manufactured goods for the American parent. If the Mexican subsidiary sold the finished goods directly to the American parent at a price reflecting the cost of manufacturing them, the American parent would pay tax on whatever profit—say, $10 million—that it earned from sales of those goods to third-party vendors. But suppose instead that the American parent created a second subsidiary in a country—say, Switzerland—that did not tax income from sales of goods manufactured elsewhere. The Mexican subsidiary could then sell the goods at a low price to the Swiss subsidiary, which could then sell them to the American parent at a relatively high price. Suppose the Swiss subsidiary's profit on those sales was $6 million. That would shift $6 million of profit from the American parent—whose income was subject to taxation in the United States—to the Swiss subsidiary, whose income (prior to the enactment of the provisions at issue here) was not subject to taxation in its home country or in the United States. The American parent could thereby defer, indefinitely, paying any tax on the $6 million.

Congress sought to prevent this kind of tax avoidance when, in 1962, it enacted Subpart F of the Internal Revenue Code. *See* Revenue Act of 1962, Pub. L. No. 87-834, 76 Stat. 960 (1962), *codified at* 26 U.S.C. §§ 951-965. Subpart F taxes an American corporation directly on certain kinds of income held by its foreign subsidiaries—which Congress referred to as "controlled foreign corporations" ("CFCs"). 26 U.S.C. §§ 954(d)(1), 957. As relevant here, income subject to taxation under Subpart F includes a CFC's foreign base company sales income ("FBCSI"—the acronym is unavoidable here). *See id.* § 954(a)(2).

Under Subpart F of the Code, two provisions determine whether a CFC has generated FBCSI. Section 954(d)(1) treats as FBCSI any income that a CFC derives from certain transactions with a "related person," which the Code defines basically to include entities related to the CFC (either as a parent, subsidiary, or entity controlled by the same entity that controls the

CFC). *See id.* § 954(d)(3). The transactions described in § 954(d)(1) are the kinds of transactions within a corporate structure—like the sale of products from the Swiss subsidiary to its American parent in the example described above—that American corporations often used (before the enactment of Subpart F) to defer taxation on income. *See* Joint Committee on Internal Revenue Taxation, *Tax Effects of Conducting Foreign Business Through Foreign Corporations*, JCS-5-61 (1961) ("hereinafter Joint Committee on Taxation").

But under the tax laws of some countries—particularly those that employed a "territorial" system of taxation, under which income generated elsewhere typically is not taxed in the corporation's home country—a corporation could avoid taxation of income by conducting certain activities (*e.g.*, selling or manufacturing) through a foreign branch or division, rather than through a separate subsidiary. Congress therefore enacted § 954(d)(2), which is a failsafe provision that applies (to paraphrase a very complex provision) when a CFC uses a foreign branch to achieve "substantially the same" tax effect—meaning the same tax-deferral effect— that American corporations had been able to achieve (before 1962) by parking income with a foreign subsidiary. 26 U.S.C. § 954(d)(2); *see also Vetco Inc. v. Comm'r of Internal Revenue*, 95 T.C. 579, 593 (1990). And when the requirements of § 954(d)(2) are met, the income "attributable to" the branch's activities "shall constitute foreign base company sales income of the controlled foreign corporation[,]" 26 U.S.C. § 954(d)(2)—which means that the CFC's American parent is taxed directly on that income.

B.

At all times relevant here, Whirlpool-US owned 100% of Whirlpool Mexico ("Whirlpool-Mex"), which was organized under Mexican law. Whirlpool-Mex in turn owned two Mexican subsidiaries: Commercial Arcos, which performed administrative functions; and Industrias Arcos, which manufactured refrigerators and washing machines for Whirlpool-Mex at two factories in Mexico. Industrias owned the real estate (land and buildings) for the two factories and the equipment used to make the appliances.

Industrias sold the finished appliances to Whirlpool-Mex, which in turn sold most of them to Whirlpool-US. Under Mexican law, Industrias paid a 28% tax on its income from

manufacturing the appliances and Whirlpool-Mex paid a 28% tax on its income from its sale of appliances to Whirlpool-US.

Beginning in 2007, however, Whirlpool restructured its Mexican operations to avoid (or at least defer indefinitely) paying taxes on most of the income attributable to its Mexican operations. An express purpose of that restructuring, according to an internal Whirlpool PowerPoint presentation, was "[d]eferral of U.S. taxation of profits earned by [Whirlpool Overseas Manufacturing]." To that end, in May 2007, Whirlpool-US created Whirlpool Overseas Manufacturing ("Lux"), a wholly owned subsidiary organized under the laws of Luxembourg. (Technically, another of Whirlpool's subsidiaries, Whirlpool Luxembourg, owned Whirlpool Overseas Manufacturing. But Whirlpool Luxembourg was primarily a holding corporation. Thus, like the Tax Court, we disregard Whirlpool Luxembourg here.) Whirlpool also created another corporation, this time under Mexican law, called Whirlpool Internacional ("WIN"), which was wholly owned by Lux. WIN had zero employees; Lux had one, who worked part-time in Luxembourg.

Yet—on paper—Whirlpool's manufacturing operations in Mexico were conducted entirely by WIN and Lux. To that end, Industrias and Commercial Arcos "subcontracted" its hourly employees (and "seconded" most of its executives) to WIN. Industrias also sold to WIN parts and tools to manufacture the appliances, and leased to WIN the real estate (again, land and buildings) for Whirlpool's two factories in Mexico. Meanwhile, Industrias sold to Lux its machinery, equipment, and title to works-in-progress (*i.e.*, unfinished appliances) at the two factories. Lux and WIN then entered into an agreement to manufacture the appliances: WIN provided manufacturing services, using Industrias's subcontracted employees and Lux's equipment (which had been purchased from Industrias); and Lux owned all the raw materials, works-in progress, and finished goods. Lux paid WIN an arm's length fee for WIN's manufacturing services.

Having made an agreement with its own subsidiary (namely WIN), Lux then made one with its parent. Specifically, Lux and Whirlpool-US entered into a Manufacturing Supply Agreement, under which Lux agreed to manufacture appliances according to Whirlpool-US's specifications (which Lux did pursuant to its agreement with WIN); and Whirlpool-US, in turn,

agreed to pay Lux "an arms' [sic] length" price for the finished appliances.  The agreement further provided that Whirlpool-US would take title to the appliances as soon as they were finished—*i.e.*, while they remained on the factory floor.  Lux also entered into an identical agreement with Whirlpool-Mex.

Meanwhile, on the ground in Mexico, nothing changed.  The same employers (Industrias and Commercial Arcos) paid the same employees to make the same appliances in the same factories, just as before the restructuring.  Only the underlying corporate arrangements had changed.

## C.

### 1.

But those arrangements were hardly arbitrary.  In large part they tracked the requirements of Mexico's "Maquiladora Program," which (among other benefits) offered reduced tax rates for "foreign principals" (*i.e.*, a foreign corporate parent) that met its requirements.  To qualify, the foreign principal (in our case Lux, a CFC of Whirlpool-US) was required to enlist a Mexican subsidiary—known as the "maquiladora" (in our case WIN)—to perform the principal's manufacturing activities at a location in Mexico.  The foreign principal was also required to provide all the necessary raw materials; to own the component parts and works-in-progress; to take title to the finished goods; and then to export them.  If those requirements were met, Mexico would tax the maquiladora at a 17% rate, rather than the usual 28%.

The foreign principal could also benefit directly from the program.  Normally, under Mexican law, a foreign corporation with a "permanent establishment" in Mexico—*e.g.*, a factory there—paid tax at a 28% rate on income attributable to that establishment (for example, profit from foreign sales of goods manufactured in Mexico).  But if (among other requirements) a foreign principal paid its Mexican subsidiary an arm's length price for its manufacturing services, then Mexico would deem the principal *not* to have a permanent establishment in Mexico—which meant that the principal would be exempt from taxation there.

Whirlpool's restructured operations in Mexico met the requirements of the Maquiladora Program. WIN performed Lux's manufacturing activities at two locations in Mexico; Lux owned the raw materials, parts, and works-in-progress; and Lux held title to the finished goods, which (as to most of the appliances) it immediately conveyed to Whirlpool-US. Moreover, Lux paid WIN an arm's-length price for its manufacturing services, with the result that Lux paid no tax in Mexico on its profit from sales of the finished appliances to Whirlpool-US. In 2009—the tax year at issue here—Lux's profit on those sales exceeded $45 million.

2.

What caught the attention of the IRS, however, was not that Lux paid no tax on that profit in Mexico, but that Lux and Whirlpool-US paid no tax on that profit at all. For there remains the curious fact that WIN's parent company was organized not in the United States or some other country in which Whirlpool had a meaningful presence, but in Luxembourg—a country in which there occurred nothing of consequence to Whirlpool's operations save the performance of administrative tasks by a single part-time employee. Corporations in Luxembourg normally paid a 28% tax on their income. But Luxembourg happened to have a treaty with Mexico, under which Luxembourgian companies paid no tax in Luxembourg on income attributable to the activities of a permanent establishment in Mexico. *See* Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Lux.-Mex., Feb. 7, 2001, Arts. 7(2), 23(1)(A).

Lux had already obtained from Mexican authorities a determination that it did not have a permanent establishment in Mexico. Yet Lux represented to Luxembourgian authorities that it *did* have a "fixed place of business" in Mexico (namely the two factories whose land and buildings Industrias had leased to WIN); that "[t]he people located in Mexico have all the necessary powers to execute contracts in the name and on behalf of [Lux] without any need to refer to the head-office" in Luxembourg; and that, "[t]herefore, [Lux] is considered *having a permanent establishment in Mexico* according to the provisions of article 5 of the Convention between Mexico and [Luxembourg] for the avoidance of double taxation[.]" (Emphasis added.) Lux did not disclose to the Luxembourgian authorities, however, that the Mexican authorities

had made the opposite determination—that Lux did *not* have a permanent establishment in Mexico.

Based on Lux's submission, the Luxembourgian authorities determined that Lux had a permanent establishment in Mexico. Lux therefore avoided not merely "double taxation" in Mexico and Luxembourg on its $45 million in profits from sales of appliances to Whirlpool-US; instead, it avoided any taxation at all.

3.

That left the United States as a jurisdiction in which Lux might be taxed on that $45 million. But WIN elected to be a "disregarded entity" for purposes of American tax law, *see* 26 C.F.R. § 301.7701-2(a), meaning (as an initial matter at least) that, for those purposes, WIN would be regarded as part of Lux itself—rather than as a separate entity and thus a "related person" under § 954(d)(1). In any event, Whirlpool Corporation represented on its 2009 tax return that none of Lux's income from its sales to Whirlpool-US (or anyone else) was FBCSI.

D.

The IRS thereafter disagreed with that representation and determined that Lux's 2009 sales income was FBCSI that should have been included in Whirlpool's income for that year. The IRS issued deficiency notices to Whirlpool accordingly. Whirlpool filed petitions in the Tax Court challenging the IRS's determination. The parties filed cross-motions for summary judgment, which the Tax Court decided in a meticulously reasoned 62-page opinion. The Tax Court granted summary judgment to neither party as to the question presented under § 954(d)(1), holding that genuine issues of material fact existed as to the application of that provision. But the Tax Court granted summary judgment to the Commissioner under § 954(d)(2), holding that "the bare text of the statute, literally read, indicates that [Lux's] sales income is FBCSI that must be included in petitioners' income under subpart F." Op. at 40. The court also determined that the IRS's implementing regulations "yield the same result by a more complicated process." Op. at 42. The Tax Court therefore entered orders upholding the deficiencies.

This appeal followed.

II.

We review de novo the Tax Court's grant of summary judgment in favor of the IRS. *See Golden v. Comm'r of Internal Revenue*, 548 F.3d 487, 492 (6th Cir. 2008). Absent some ambiguity incapable of resolution by means of all the tools of statutory construction, we give effect to our interpretation of the statute without regard to any divergent interpretations offered by the agency. *See Montgomery County v. F.C.C.*, 863 F.3d 485, 489 (6th Cir. 2017). There is no such ambiguity here.

A.

The question presented is whether Lux's income from its sales of appliances to Whirlpool-US and Whirlpool-Mexico in 2009 is FBCSI under §954(d)(2). That provision provides in full:

> **Certain branch income.** For purposes of determining foreign base company sales income in situations in which the carrying on of activities by a controlled foreign corporation through a branch or similar establishment outside the country of incorporation of the controlled foreign corporation has substantially the same effect as if such branch or similar establishment were a wholly owned subsidiary corporation deriving such income, under regulations prescribed by the Secretary the income attributable to the carrying on of such branch or similar establishment shall be treated as income derived by a wholly owned subsidiary of the controlled foreign corporation and shall constitute foreign base company sales income of the controlled foreign corporation.

As the Tax Court aptly observed, § 954(d)(2) consists of a single (nearly interminable) sentence that specifies two conditions and then two consequences that follow if those conditions are met. The first condition is that the CFC was "carrying on" activities "through a branch or similar establishment" outside its country of incorporation. The second condition is that the branch arrangement had "substantially the same effect as if such branch were a wholly owned subsidiary corporation [of the CFC] deriving such income[.]" If those conditions are met, then two consequences follow as to "the income attributable to" the branch's activities: first, that income "shall be treated as income derived by a wholly owned subsidiary of the controlled foreign corporation"; and second, the income attributable to the branch's activities "shall

constitute foreign base company sales income of the controlled foreign corporation." 26 U.S.C. § 954(d)(2).

1.

We begin with the conditions. The first condition—that Lux "carr[ied] on" activities "through a branch or similar establishment" outside its country of incorporation—is undisputedly met here. Lux (the CFC) was a Luxembourgian corporation acting through WIN in Mexico; and WIN itself, through its disregarded-entity election in 2009, asked to be treated as a branch (rather than a subsidiary) of Lux for federal tax purposes.

To meet the second condition, the branch arrangement must have had "substantially the same effect as if such branch or similar establishment were a wholly owned subsidiary deriving" the income attributable to the branch's activities. *Id*. The meaning of that phrase presents the principal interpretive question in this appeal.

We construe statutory text as it would have been understood "at the time Congress enacted the statute." *Wisconsin Central Ltd. v. U.S.*, 138 S.Ct 2067, 2070 (2018) (cleaned up). And "when a statute, like this one, is 'addressing a technical subject, a specialized meaning is to be expected.'" *Van Buren v. United States*, 141 S.Ct. 1648, 1658 n.7 (2021) (cleaned up) (quoting Scalia & Garner, *Reading Law* 73 (2012)). Thus we ask what "'an appropriately informed' speaker of the language would understand" that specialized meaning to be. *Van Buren*, 141 S.Ct. at 1657 (quoting Nelson, *What is Textualism?*, 91 Va. L. Rev. 347, 354 (2005)).

The phrase at issue here—"substantially the same effect as if such branch or similar establishment were a wholly owned subsidiary deriving such income"—would have resonated loudly with an informed reader when Subpart F was enacted in 1962. The year before, as noted above, President Kennedy had deplored the growing use of "artificial arrangements between parent and subsidiary regarding intercompany pricing, the transfer of patent licensing rights, the shifting of management fees, and similar practices which maximize the accumulation of profits" in tax havens "so as to exploit the multiplicity of foreign tax systems and international agreements in order to reduce sharply or eliminate completely their tax liabilities both at home

and abroad." Message from the President of the United States Relative To Our Federal Tax System, April 20, 1961, *reprinted in* H.R. Doc. No. 87-140, at 6 (1961).

In response to the president's speech, the staff of the Joint Committee on Internal Revenue Taxation issued a report, dated July 21, 1961, on the use of foreign subsidiaries by multinational American corporations to defer the taxation of income. That report likewise observed: "by conducting its foreign operations though a corporation organized under the laws of a foreign country an American parent corporation can postpone the tax on income earned by a foreign subsidiary until that income is returned to the U.S. parent as dividends or otherwise." Joint Committee on Taxation, at 5.

The Joint Committee's report described in detail various ways that American corporations at that time had actually used foreign subsidiaries to defer taxation of income. To cite one notable example of many in the report, an American corporation was "engaged in the manufacture and sale of various types of machines and equipment which [were] sold to companies in the United States and in many foreign countries[.]" *Id.* at 11. The American corporation established a "foreign subsidiary corporation" with "headquarters in a country which ha[d] no income tax." *Id.* The American corporation then shifted income to the foreign subsidiary "to obtain 'a greater immediate cash flow resulting from tax deferral which could be used to finance the expansion of overseas business.'" *Id.* at 12. (quoting "[r]epresentatives" of the foreign subsidiary). The report separately discussed "a foreign subsidiary which manufacture[d] for its American parent parts or finished products which it then [sold] to the American parent corporation for distribution in the United States"; and the report noted that, "[t]o the extent that the foreign subsidiary charges a disproportionately high price, its income will be unrealistically high and the income of the American parent will be unrealistically low." *Id.* at 13.

The report also observed that "in many cases the abuse resulting from the use of a foreign subsidiary consists in the fact that the foreign subsidiary has little, if any substance and does not, in fact, function as an operating commercial corporation." *Id.* at 15. For example, one American manufacturer "organized an international subsidiary under the laws of Liechtenstein which, nominally at least," performed sales operations "throughout the world" for its American parent.

*Id.* Although the Liechtenstein subsidiary "employ[ed] few, if any, salesmen," it received up to "80 percent" of the income from the American company's foreign operations. As to this example, the report concluded: "[T]he profits thus allocated to the Liechtenstein corporation are grossly disproportionate to the real value of what little work that corporation does." *Id.*

In a statement submitted to Congress in 1961, the Secretary of the Treasury similarly emphasized the recent "proliferation of corporate entities in tax haven countries, like Switzerland." Statement of Douglas Dillon, Secretary of the Treasury, before the House Ways and Means Committee *reprinted in* Joint Committee on Taxation 21, 23 (1961). "[I]n the year ended March 31, 1961" for example, American companies created 170 new subsidiaries in Switzerland—an increase of more than 50%. *Id.* "Increasingly," the Secretary observed, "U.S. manufacturing subsidiaries operating elsewhere . . . are being linked to subsidiaries in the tax haven countries." *Id.* The Commissioner of Internal Revenue likewise observed in a 1961 memorandum: "In recent years the number of foreign corporations owned directly or indirectly by U.S. shareholders has increased rapidly." Memorandum of Comm'r of Internal Revenue dated June 22, 1961, *reprinted in* Joint Committee on Taxation 28, 28 (1961). And though the Service had difficulty distinguishing subsidiaries that had "real business purposes" from those that did not, the Commissioner was certain that "some ha[d] been organized for the sole purpose of avoiding the payment of U.S. taxes that would otherwise be due." *Id.*

In this historical context, an informed reader would have understood the phrase at issue here—"substantially the same effect as if such branch or similar establishment were a wholly owned [foreign] subsidiary deriving such income"—to be nearly a term of art. The practice of shifting income to "wholly owned subsidiar[ies]" overseas was associated, above all, with one "effect": tax deferral. Subpart F in general and § 954 in particular are overwhelmingly focused on preventing precisely that effect. Thus, as a matter of historical and statutory context alike, an informed reader would naturally understand the "effect" to which § 954(d)(2) refers to be a *tax-deferral effect*. We therefore agree with the Tax Court that the phrase "substantially the same effect," as used in § 954(d)(2), refers to the "deferral of tax" on sales income. Op. at 40. Indeed, no one in this appeal disputes that aspect of the Tax Court's reasoning.

The second condition of § 954(d)(2), then, is that the CFC's "carrying on of activities" through a foreign branch had a substantial tax-deferral effect. That condition is plainly met here: the Tax Court found—and Whirlpool again does not dispute—that, "[b]y carrying on its activities 'through a branch or similar establishment' in Mexico, [Lux] avoided *any* taxation of its sales income." *Id.* (emphasis added). Indeed, as noted above, an express purpose of Whirlpool's 2007 restructuring was "[d]eferral of U.S. taxation of profits earned by [Lux]."

Meanwhile, Whirlpool does not dispute that Lux's income from its sales of appliances to Whirlpool-US and Whirlpool-Mexico in 2009 was "attributable to" the activities of its Mexican branch. To the contrary, Whirlpool itself contends (albeit in a different context) that "the income at issue constituted income attributable to the Manufacturing [*i.e.*, Mexican] Branch and not [Lux]." Whrlpl. Br. 51.

From these premises, § 954(d)(2) expressly prescribes the consequences that follow: first, that the sales income "attributable to" the "carrying on" of activities through Lux's Mexican branch "shall be treated as income derived by a wholly owned subsidiary" of Lux; and second, that the income attributable to the branch's activities "shall constitute foreign base company sales income of" Lux. That second consequence directly answers the question presented in this appeal.

We acknowledge that § 954(d)(2) states that, if the provision's two conditions are met, then "under regulations prescribed by the Secretary" the provision's two consequences "shall" follow. And Whirlpool makes various arguments as to those regulations, seeking a result different from the one mandated by the statute itself. But the agency's regulations can only implement the statute's commands, not vary from them. (The Tax Court read the "under regulations" text the same way. *See* Op. at 38 ("The Secretary was authorized to issue regulations implementing these results.")). And the relevant command here—that Lux's sales income "shall constitute foreign base company sales income of" Lux—could hardly be clearer.

Our dissenting colleague—in a thoughtful opinion, in this difficult case—reads the "under regulations" text to condition the two commands (the "shall[s]") that follow. But that reading would delegate to the Secretary unfettered discretion to determine whether *any*

consequences follow when the two conditions of § 954(d)(2) are met. That would amount to a power to do much more than "fill up the details." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825) (Marshall, C.J.). The dissent also argues that our reading of § 954(d)(2) would allow income from sources other than sales—for example, interest income—to be treated as FBSCI. But perhaps here the acronym gets in the way. Section 954(d)(2) twice refers not merely to "income," but to "foreign base company *sales* income"—which makes clear enough the provision is confined to income from sales. We therefore agree with the Tax Court that, under the text of the statute alone, "[Lux's] sales income is FBCSI that must be included in petitioners' income under subpart F." Op. at 40.

2.

Whirlpool's remaining arguments in opposition to that conclusion are insubstantial. First, Whirlpool argues that § 954(d)(2) allows only "income of the branch"—as opposed to income held, as here, by the CFC—to be treated as FBCSI of the CFC. Whrlpl. Br. 30. But that argument glosses over the words of the provision itself. Section 954(d)(2) says that, if the provision's two conditions are met, "the income *attributable to*" the branch's activities "shall be treated as income derived by a wholly owned subsidiary and shall constitute foreign base company sales income of the [CFC]." (Emphasis added.) "Attributable" means "resulting from[.]" *The Random House Dictionary of the English Language* 96 (1966); *see also, e.g.*, *The Am. Heritage Dictionary* 86 (1969) (same). Thus, for income to be "attributable to" a branch's activities, the branch itself need not hold or obtain the income; rather, the income need only result from the branch's activities. And here, as Whirlpool itself has conceded, Lux's sales income resulted from the activities of its Mexican branch, as opposed to the activities of Lux's single part-time employee. That income was therefore was "attributable to" the branch's activities.

Whirlpool also invokes the heading of § 954(d)(2): "Certain branch income." But that phrase can easily be construed to comprise income attributable to a branch as well as income held by it. More to the point, the provision's text says "attributable to"; and "'the heading of a section cannot limit the plain meaning of the text.'" *United States v. Michael*, 882 F.3d 624, 629

(6th Cir. 2018) (quoting *Bhd. of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 528-29 (1947)). Whirlpool's argument is without merit.

Second, Whirlpool argues that § 954(d)(2) standing alone cannot support a determination that Lux's sales income is FBCSI. On this point Whirlpool first cites the introductory clause of § 954(d)(2), which reads: "For purposes of determining foreign base company sales income[.]" Whirlpool then points to § 954(d)(1), which states that "foreign base company sales income means income" from four types of transactions involving a "related person[.]" Thus, in Whirlpool's view, if the conditions of § 954(d)(2) are met, the transaction at issue must still fit within one of the four types of transactions described in § 954(d)(1)—when treating the branch as a "wholly owned subsidiary of the [CFC,]" as prescribed in the first consequence of § 954(d)(2)—in order for the income from the transaction to be treated as FBCSI of the CFC.

But that argument overlooks the structure of the two provisions and the emphatic terms of § 954(d)(2) itself. Section 954(d)(1) sets forth a general rule: it identifies four types of transactions that tend to result in tax deferral, and says that income resulting from them is FBCSI. Section 954(d)(2), in contrast, sets forth a special rule—one that applies (to pick up where the introductory clause leaves off) "in situations in which the carrying on of activities by a controlled foreign corporation through a branch or similar establishment outside the country of incorporation of the controlled foreign corporation has substantially the same effect as if such branch or similar establishment were a wholly owned subsidiary corporation deriving such income[.]" As explained above, that "situation" already includes—as the provision's second condition—the circumstance that the branch arrangement results in a deferral of tax on sales income. Thus, whereas § 954(d)(1) involves an intermediate step for determining whether a transaction results in tax deferral—namely, the determination whether the transaction at issue is of a type that tends to cause that result—§ 954(d)(2) cuts to the bottom line of deferral itself. And having cut to that bottom line, § 954(d)(2)'s terms are peremptory: if the provision's two conditions are met, the income at issue "*shall constitute foreign base company sales income of the [CFC]*." (Emphasis added.) We have no license or reason to read into § 954(d)(2)'s introductory clause a putative implication that renders meaningless that statutory command.

Here, § 954(d)(2)'s conditions are met; the consequences that follow are clear from the statute itself.

\* \* \*

The Tax Court's judgment is affirmed.

_____

**DISSENT**

_____

NALBANDIAN, Circuit Judge, dissenting.   This is a hard case.   It involves a complicated statute and an even more complicated set of regulations.  The majority thoughtfully engages with both and comes to a reasoned conclusion.  But I see this case differently.  In my view, LUX didn't generate taxable foreign base company sales income because it "manufactured" the property it bought and sold.  *See* 26 C.F.R. § 1.954-3(a)(4)(ii).[1]  And that's true even if we shuffle the relevant transactions under 26 U.S.C. § 954(d)(2).  Thus, I dissent.

I.

This case is about statutory interpretation.  There are two relevant statutory provisions, 26 U.S.C. §§ 954(d)(1) and (d)(2).  The majority relies on the latter to hold that LUX generated FBCSI.  But the key here is solving the relationship between these two provisions.  To that end, I start with some brief background.

Before Congress passed the Revenue Act of 1962, income a foreign corporation earned from sources outside the United States generally was not subject to federal tax, even if an American shareholder controlled the corporation.  *See Dave Fischbein Mfg. v. Comm'r*, 59 T.C. 338, 353 (1972).  Predictably, this led to the use of "tax havens"—countries "within which only minimal business operations were carried on in order to insulate income from U.S. tax." *Vetco Inc. v. Comm'r*, 95 T.C. 579, 585 (1990).   In other words, the Revenue Code allowed multinational corporations to "realize substantial tax savings by using a subsidiary organized in a tax haven as a base for its foreign operations."  Eric T. Laity, *The Foreign Base Company Sales Income of Controlled Foreign Corporations*, 31 Cornell Int'l L. J. 93, 94 (1998).

As the majority points out, Congress tried to rein some of this in with the Revenue Act of 1962.  The Act added Subpart F income to the Internal Revenue Code.  *Vetco*, 95 T.C. at 585–

_____

[1]The regulations at issue changed in 2008.  But the Tax Court found that Whirlpool elected to proceed under the *old* regulations and not the new ones.  The Commissioner does not challenge that on appeal.  (Appellee Br. at 71–72 n.25.)  So this opinion relies on the regulations as they formerly existed.

86; *see generally* 26 U.S.C. § 951 et seq. As a result, U.S. shareholders of "controlled foreign corporations" (CFCs) must pay taxes on their pro rata share of the CFC's Subpart F income.[2] *Vetco*, 95 T.C. at 585–86; *see* 26 U.S.C. § 951(a)(1)(A).

What is Subpart F income? It comes in several forms. Relevant here, Subpart F income includes "foreign base company income." *See* 26 U.S.C. § 952(a)(2). And foreign base company income includes "foreign base company *sales* income," which we call FBCSI. *Id.* § 954(a)(2) (emphasis added). Thus, U.S. shareholders of a CFC must pay their pro rata share of taxes on the CFC's FBCSI. *See id.* §§ 951(a)(1)(A), 952(a)(2), 954(a)(2). Translated into more familiar terms, Whirlpool must pay its pro rata share of LUX's foreign base company sales income. So whether Whirlpool owes taxes on LUX's income depends on whether that income qualifies as FBCSI.

## A.

I don't believe LUX generated FBCSI here. FBCSI comes in two forms. The first is income from a Related-Person Transaction.[3] *See* 26 U.S.C. § 954(d)(1). Under § 954(d)(1), FBCSI is "income derived in connection with" four types of related-person sales transactions:

1. The purchase of personal property from a related person and its sale to anyone;

2. The purchase of personal property from anyone and its sale to a related person;

3. The sale of personal property to anyone on behalf of a related person; or

4. The purchase of personal property from anyone on behalf of a related person.

"Section 954(d)(1) sets forth the general rule defining FBCSI" by laying out these four triggering transactions. *Vetco*, 95 T.C. at 590. But perhaps aware that "Americans have never had much enthusiasm for paying taxes," *CIC Servs., LLC v. I.R.S.*, 141 S. Ct. 1582, 1586 (2021), Congress also enacted 26 U.S.C. § 954(d)(2), the Branch Rule. That Rule is designed to prevent CFCs from skirting § 954(d)(1) by transacting with a *branch* instead of a wholly owned

---

[2]A CFC is a foreign corporation for which a U.S. shareholder owns more than half of the voting power or total value of the corporation. *See* 26 U.S.C. § 957(a). LUX is a CFC of Whirlpool.

[3]A related person is "any entity that controls, is controlled by, or is under common control with" a CFC. Laity, *supra* at 95; *see also* 26 U.S.C. § 954(d)(3).

subsidiary. *See Vetco*, 95 T.C. at 593. That's because a branch isn't a "related person" under § 954(d)(3), *see id.* at 591–92, meaning a CFC's transaction with a branch wouldn't trigger (d)(1) because (d)(1) requires a transaction with a related person. *See* 26 U.S.C. § 954(d)(1).

The majority reads (d)(1) and (d)(2) as independent of each other. In other words, both (d)(1) and (d)(2), of their own force, define FBCSI. But I disagree. Instead, I read § 954(d)(2)'s text and structure as directing us back into the (d)(1) framework. And that framework features an exception to FBCSI (the Manufacturing Exception) that I believe LUX satisfies here. At the very least, there's a disputed question of material fact whether the Exception applies. And so I think summary judgment for the Commissioner is inappropriate.

B.

The majority says LUX generated FBCSI through the Branch Rule. So let's look at the Rule's complicated text.[4] It kicks in when a CFC's "carrying on of activities . . . through a branch or similar establishment outside the [CFC's] country of incorporation . . . has substantially the same effect as if such branch or similar establishment were a wholly owned subsidiary corporation." 26 U.S.C. § 954(d)(2). When the Rule is triggered, "under regulations prescribed by the Secretary [of the Treasury] the income attributable to the carrying on" of the branch's activities is "treated as income derived by a wholly owned subsidiary of the" CFC and "shall constitute" FBCSI of the CFC. *Id.*

The majority reads this as a simple set of conditions and consequences—the most important consequence being that certain income "shall constitute" taxable FBCSI. So if a

---

[4]In full, the provision reads:

> For purposes of determining foreign base company sales income in situations in which the carrying on of activities by a controlled foreign corporation through a branch or similar establishment outside the country of incorporation of the controlled foreign corporation has substantially the same effect as if such branch or similar establishment were a wholly owned subsidiary corporation deriving such income, under regulations prescribed by the Secretary the income attributable to the carrying on of such activities of such branch or similar establishment shall be treated as income derived by a wholly owned subsidiary of the controlled foreign corporation and shall constitute foreign base company sales income of the controlled foreign corporation.

26 U.S.C. § 954(d)(2).

CFC's use of a branch satisfies the statutory conditions, (d)(2)'s mandate is clear: The income earned "shall constitute" FBCSI.

But I'm not so sure that's the right reading. Instead, the statutory structure only makes sense if (d)(2) transactions filter back through (d)(1)'s framework, including its Manufacturing Exception. Moreover, § 954(d)(2) *explicitly* tells us that income a CFC earns through a branch "shall constitute" FBCSI "*under regulations prescribed by the* Secretary [of the Treasury]." 26 U.S.C. § 954(d)(2) (emphasis added). And § 954(d)(2)'s regulations instruct us to subject a (d)(2) transaction to (d)(1)'s framework and exceptions. *See* 26 C.F.R. § 1.954-3(b)(2)(ii)(e).

Let me explain. At its core, § 954(d)(2) creates a fiction. It takes certain *branches* of a CFC and treats them as *wholly owned subsidiaries*. That's because, as I already mentioned, a branch isn't a "related person" within (d)(1). *See Vetco*, 95 T.C. at 591–92; *see also* 26 U.S.C. § 954(d)(3). And so Congress included the Branch Rule in § 954(d) "to prevent CFCs from avoiding section 954(d)(1) because there would be no transaction with a related person within the meaning of section 954(d)(3)." *Vetco*, 95 T.C. at 593. Put differently, § 954(d)(2) "*simply supplies the relationship* required to bring an otherwise unrelated party within the spectrum of section 954(d)(1)." *Id.* at 591–92 (emphasis added). That's why § 954(d)(2)'s fiction treats branches as wholly owned subsidiaries—the latter is a "related person" subject to § 954(d)(1). *See id.*; *see also* § 954(d)(3). Thus, I think that if we have a (d)(2) transaction—i.e., a qualifying branch-remainder transaction—we still need to make sure there is a (d)(1) transaction. And we also need to check and see if any of (d)(1)'s regulatory exceptions apply.

To explain, let's look again at the text of (d)(2). It starts by noting why it exists: "For purposes of determining [FBCSI]"—which (d)(1) defines by reference to four types of Related-Person Transactions. 26 U.S.C. § 954(d)(2); *see id.* § 954(d)(1). Then it creates the wholly-owned-subsidiary fiction—treating a branch as a wholly owned subsidiary—before saying that "the income attributable" to the branch's activities "shall constitute" FBCSI of the CFC.

At first glance, then, it looks like (d)(2) might suffice on its own to create FBCSI, which is the majority's view. After all, the last clause in the provision says income attributable to a branch's activities "shall constitute" FBCSI. So, as the majority notes, "the statutory command

. . . could hardly be clearer." But this reading of "shall constitute" is problematic for a few reasons.

For starters, § 954(d)(2) modifies "shall constitute" with "under regulations prescribed by the Secretary." *See* 26 U.S.C. § 954(d)(2). Read naturally, then, the provision says that "income attributable" to the branch's activities "shall constitute" FBCSI "under regulations prescribed by the Secretary." This means that Congress gave Treasury a role in defining when branch transactions generate FBCSI. So the "statutory command" isn't quite what the majority makes it out to be. And as I explain below, the regulations applicable here tie (d)(2) back into (d)(1) and instruct us to apply the Manufacturing Exception to the (d)(2) transaction.

But before turning to those regulations, let's stay in the text. If "shall constitute" is enough by itself to label income FBCSI, then all sorts of income would be open to designation as FBCSI, *even if no sales transaction occurred*. (An odd result, given that § 954(d) is all about *sales* income.) That's because nothing in (d)(2) cabins the type of income Treasury could target. All it says is "income attributable" to the branch's activities could be FBCSI. This causes both a conceptual and a practical problem. Conceptually, (d)(1) defines FBCSI by reference to certain Related-Person Transactions. And (d)(2) starts off by noting that it's there "[f]or purposes of determining foreign base company sales income" when a CFC uses a branch. 26 U.S.C. § 954(d)(2). But if Treasury could designate income as FBCSI even with no Related-Person Transactions occurring, the internal logic of the statute would collapse. Income arising *apart from* a Related-Person Transaction is FBCSI, even though FBCSI is defined directly by reference to Related-Person Transactions.

Maybe (d)(1) isn't the only provision that's allowed to define FBCSI. So (d)(2), just like (d)(1), can designate something FBCSI. But that still causes a practical problem. Reading "shall constitute" without applying the (d)(1) framework gives no insight into *which* branch transactions generate FBCSI. Besides "income attributable to a branch's activities," there is no relevant referent from which to calculate a CFC's tax liability. What activities generate FBCSI, and how much of the income from those activities is taxable? Under a literal reading of "shall constitute," *any* activity could generate FBCSI, no matter if it involves a Related-Person sales

transaction, so long as it's "attributable" to the branch's activities. Again, that's an odd result when we're trying to determine if a transaction generated foreign base company *sales* income.

Perhaps this abuse is unlikely. After all, what income but sales income would even arise in this context? But this case is a good example of why abuse is at least *possible*. One of LUX's functions is financing other Whirlpool subsidiaries. And it generates considerable interest income from its inter-company loans. Could interest income LUX earns from a loan to WIN constitute FBCSI? If it is "income attributable to the carrying on" of WIN's activities, then it would be FBCSI under a literal reading of (d)(2)'s last clause. And if WIN's manufacturing income enables it to pay LUX interest on its financing, and WIN was created by inter-company financing, perhaps LUX's interest income would be "income attributable to" WIN's activities and thus FBCSI.

So reading "shall constitute" to mean (d)(2) transactions generate FBCSI without reference to a (d)(1) transaction raises fundamental problems. And it renders part of § 954(d)(2) superfluous. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012). Indeed, if "shall constitute" can independently create FBCSI, then what purpose does the "wholly owned subsidiary" fiction from § 954(d)(2) serve? Remember, that fiction "supplies the relationship required to bring an otherwise unrelated party within the spectrum of section 954(d)(1)." *Vetco*, 95 T.C. at 591–92. But if "income attributable" to the branch's activities "shall constitute" FBCSI even without applying (d)(1), the wholly-owned-subsidiary fiction becomes useless. Perhaps this is why even the government here agrees with this reading of (d)(2). (*See* Appellee Br. at 34–35 & n.14.) On the other hand, if we read (d)(2) as the Tax Court did in *Vetco* to supply a missing Related-Person relationship—running the branch transaction through the (d)(1) framework—that allows us to account for the fiction.

Would my reading make "shall constitute" superfluous? No. Remember, § 954(d)(2) modifies "shall constitute" with "under regulations prescribed by the Secretary." *See* 26 U.S.C. § 954(d)(2). So "income attributable" to the branch's activities "shall constitute" FBCSI "under regulations prescribed by the Secretary." We can easily read "shall constitute" in context as giving Treasury a role in defining when branch transactions generate FBCSI. In fact, Treasury has already accepted that invitation. And as it happens, the regulations it issued tie (d)(2) back

into (d)(1) and instruct us to apply (d)(1)'s exceptions to the (d)(2) transaction. The upshot of that is this: LUX qualifies for one of these exceptions and so didn't generate FBCSI here.

C.

Let's turn to the regulations. The relevant (d)(2) manufacturing branch regulations have two main parts. The first tells us how to determine whether the use of a branch has substantially the same effect as use of a subsidiary. 26 C.F.R. § 1.954-3(b)(1)(ii)(b). It does so with a "tax rate disparity" test. If, under the test, a tax rate disparity exists, then use of a branch has "substantially the same effect" as use of a wholly owned subsidiary. *See id.*; 26 U.S.C. § 954(d)(2). Completing that Step 1 analysis is unnecessary for my argument here.

Assuming a tax rate disparity exists under Step 1, Step 2 of the regulations kicks in. *Id.* § 1.954-3(b)(2)(ii). Under Step 2, "the determination of whether [the branch] or the remainder of the [CFC] . . . has [FBCSI] shall be made by applying" certain rules. *Id.* The regulation then lists those rules. *See id.* § 1.954-3(b)(2)(ii)(a)–(f). For instance, just like (d)(2), the regulation tells us to treat the branch as a wholly owned subsidiary incorporated in its country of location. *Id.* § 1.954-3(b)(2)(ii)(a). It also tells us to treat a sale by the remainder as a sale performed "on behalf of" the branch. *Id.* § 1.954-3(b)(2)(ii)(c). (Note that an on-behalf-of sale is one of the four categories of transactions that generates FBCSI under § 954(d)(1).) Likewise, it tells us that if income is FBCSI under (d)(1), or is FBCSI under a different regulation, then we should not recount it again under (d)(2)'s manufacturing branch rule. *Id.* § 1.954-3(b)(2)(ii)(d), (f). And finally, it tells us that if income would not be FBCSI if the branch and remainder were separate corporations, then it's not FBCSI under § 954(d)(2). *Id.* § 1.954-3(b)(2)(ii)(e).

But that's it. After applying those rules, we reach the end of the rope. But notice what's missing: Anything stating that specific income is FBCSI. The (d)(2) regulations instruct us to apply certain fictions to the branch and remainder, but then they stop. So Step 2 of the (d)(2) manufacturing branch regulations—which we apply when determining "whether such branch . . . or remainder . . . has [FBCSI]"—just tells us to treat the branch and remainder as separate corporations and view the remainder's sales as performed "on behalf of" the branch. It doesn't

say *which* branch transactions to look at when determining whether a CFC has FBCSI. Nor does it, of its own force, label any income FBCSI.

The only logical reason for this is that the regulation expects the (d)(2) transaction to filter back through the (d)(1) framework. Indeed, the regulation gives us the exact ingredients we need to make out a (d)(1) transaction. We have related persons, *see id.* § 1.954-3(b)(2)(ii)(a) (treating the branch as a wholly owned subsidiary), and we have a (d)(1) transaction, *see id.* § 1.954-3(b)(2)(ii)(c) (treating the remainder's selling activities as done on behalf of the branch); *see also* 26 U.S.C. § 954(d)(1). We just don't have a provision calling anything FBCSI unless we look back to (d)(1)'s framework.

Even if that weren't enough to establish that (d)(2) filters back through (d)(1), the regulation leaves little doubt. It explicitly tells us to apply the (d)(1) *exceptions* to the (d)(2) transaction. "Income derived by the branch . . . or by the remainder . . . shall not be considered [FBCSI] if the income *would not be so considered if it were derived by a separate controlled foreign corporation under like circumstances*." *Id.* § 1.954-3(b)(2)(ii)(e) (emphasis added). This provision implies that "the results to a CFC [can] be no worse off as a result of using a branch than of using a wholly-owned subsidiary." Mary F. Voce, *Foreign Base Company Sales Income: A Primer and An Update*, 53 Tax Lawyer 327, 349 (2000). Put differently, if treating the branch and remainder as separate companies (and related persons) means the transaction at issue would *not* generate FBCSI under (d)(1), then neither will the transaction generate FBCSI under (d)(2). *See id.* And because (d)(1)'s exceptions, including the Manufacturing Exception, operate upon income's status as FBCSI (i.e., when an exception is met, the income is not FBCSI), we should check for the applicability of those exceptions to a (d)(2) transaction through § 1.954-3(b)(2)(ii)(e). That means, even putting the statutory structure to the side, we must check if the Manufacturing Exception applies here, even though we are within the Branch Rule under (d)(2).

One last regulatory argument suggests we apply the (d)(1) regulatory exceptions to the (d)(2) transaction. Recall that the first part of the (d)(2) manufacturing branch regulations tells us how to determine whether there is a tax rate disparity. As part of that calculation, we allocate to the remainder "income derived by the remainder" that would be FBCSI under (d)(1), but *without applying* (d)(1)'s exceptions. 26 C.F.R. § 1.954-3(b)(1)(ii)(b); *see also id.* § 1.954-

3(b)(2)(i). But once we determine that the use of a branch has the same effect as a wholly owned subsidiary, we apply a *different* set of rules, this time from the second part of (d)(2)'s manufacturing branch regulations. *See id.* § 1.954-3(b)(2)(ii). And missing from that set of rules is any requirement that we refrain from applying (d)(1)'s exceptions. Instead, § 1.954-3(b)(2)(ii)(e) says the opposite—that we *should* apply the (d)(1) exceptions. So Treasury knew how to tell us when not to apply the (d)(1) exceptions to a (d)(2) transaction, but it elected to do so only for determining whether a tax rate disparity exists, and not for determining whether a specific transaction generated FBCSI.

That we should filter (d)(2) transaction back through the (d)(1) framework makes sense when we consider why (d)(2) exists in the first place. It's there so that CFCs can't evade (d)(1) by using a branch to avoid a Related-Person Transaction. It makes little sense, then, to treat a CFC *worse* for using a branch than it would be treated under (d)(1). *See* Voce, *supra* at 349. That's why (d)(2)'s regulations say that if the CFC wouldn't have FBCSI were the branch and remainder separate companies, then it shouldn't have FBCSI under (d)(2). *See* 26 C.F.R. § 1.954-3(b)(2)(ii)(e). So if a transaction wouldn't generate FBCSI under (d)(1) because of the Manufacturing Exception, then neither will it generate FBCSI just because the CFC used a branch. *See id.*

In short, the structure of § 954(d)(2) supports running a branch transaction through the (d)(1) framework, and the regulations—which no one challenges here—tell us *explicitly* to do so. And applying the Manufacturing Exception here means LUX didn't generate taxable FBCSI.

D.

Though the statutory and regulatory language and structure establish that (d)(2) branch transactions run back through the (d)(1) framework, I also note some other support for my position. Tax scholars, for instance, agree not only that (d)(2) transactions filter through (d)(1), but that § 1.954-3(b)(2)(ii)(e) means we apply (d)(1)'s exceptions, including its Manufacturing Exception, to a branch-remainder transaction. Voce, *supra* at 347–48 ("[T]he Branch Rule of section 954(d)(2) is only intended to subject transactions between a CFC and a branch to the same rules that are applicable to transactions between the CFC and a subsidiary under section

954(d)(1), not to create a different or more stringent test for what constitutes FBCSI."); *see also* Laity, *supra* at 145 (noting that "[w]hen computing this additional foreign base company sales income, the U.S. shareholders may use" the (d)(1) exceptions); Dolan, et al., *supra* § 18.06 at *8.

Notably, the IRS agrees with my framework. In Technical Advice Memorandum 8509004 (1984), for instance, the IRS applied the Manufacturing Exception to a branch transaction through § 1.954-3(b)(2)(ii)(e). Citing (e), the IRS noted that "income derived by the branch or the remainder . . . will not be considered foreign base company sales income if such income would not be so considered if it were derived by a separate CFC under like circumstances. Under [the Manufacturing Exception], income derived by the branch . . . would not constitute foreign base company sales income *since the branch manufactured and sold Product Z.*" Technical Advice Memorandum 8509004 (1984) (emphasis added). It did the same in an earlier Private Letter Ruling. *See* Private Letter Ruling 7612101490A (1976) ("The income of NEWCO *** as a manufacturing branch is not subpart F income under section 954(d)(1)(A) . . . because its income is derived from sales of property it manufactures."). And, importantly, it takes the same position in its briefing here. (*See* Appellee Br. at 34–35 & n.14.)

II.

What's the consequence of all this? Whether we place LUX's relevant sales within the (d)(1) or (d)(2) bucket, we need to check whether the Manufacturing Exception applies. To be sure, under (d)(1), LUX made sales to a related person (Whirlpool U.S. and Mexico) *and* probably on behalf of a related person (WIN). So it has a (d)(1) *transaction*. Likewise, under (d)(2), LUX's use of WIN likely had "substantially the same effect" as if WIN were a wholly owned subsidiary of LUX and not a branch. Thus, however we cut it, LUX has a qualifying transaction.

But we still need to check if any exceptions to FBCSI apply. That's the explicit command of § 1.954-3(b)(2)(ii)(e), and it's the implicit route the statutory and regulatory structure say we should take. Recall that except for federal taxation, WIN is a wholly owned subsidiary of LUX. So for the 1.954-3(b)(2)(ii)(e) inquiry, we can say WIN is a wholly owned subsidiary of LUX and thus a separate corporation. Viewing it that way brings us back under

§ 954(d)(1) since wholly owned subsidiaries are related to their owner. Under that arrangement, did LUX generate FBCSI? The answer is no, because of the Manufacturing Exception.

The Manufacturing Exception is a regulatory provision. *See* 26 C.F.R. § 1.954-3(a)(4). Under the regulation, "income of a [CFC] derived in connection with the sale of personal property *manufactured, produced, or constructed by such corporation* in whole or in part from personal property which [the CFC] has purchased" is not FBCSI. *Id.* § 1.954-3(a)(4)(i) (emphasis added). A CFC "[is] considered" to have manufactured the personal property it buys and then sells "if the property sold is in effect not the property which it purchased." *Id.* And the property sold is not the property purchased if it "is *substantially transformed* prior to sale." *Id.* § 1.954-3(a)(4)(ii) (emphasis added). The regulation gives a few examples of substantial transformation: wood pulp to paper; steel rods to screws and bolts; and tuna fish to canned fish. *Id.*

All this means that if the property LUX bought "[wa]s substantially transformed" before LUX sold it, then those sales did not generate FBCSI. And I find it hard to believe that substantial transformation didn't occur here. Transforming sheets of metal into functioning household appliances is surely a more "substantial transformation" than turning steel rods into screws.

The Commissioner's only response to this intuitive conclusion is that LUX itself didn't do the transforming, so it shouldn't qualify for the exception. The Tax Court shared the Commissioner's concern. Though the court recognized that the property LUX bought underwent substantial transformation before its sale, the court waffled over how much LUX monitored or controlled the manufacturing employees' work, which took place in Mexico.

But the Commissioner and Tax Court read language into the regulation that isn't there.[5] The Manufacturing Exception focuses on the *object* being transformed, not the *entity* doing the

---

[5]Notably, the *new* regulations covering FBCSI contain the language the Commissioner tries to read into the old regulations. Now, to take advantage of the Manufacturing Exception, a CFC must perform the manufacturing "through the activities of its employees." 26 C.F.R. § 1.954-3(a)(4). Moreover, a CFC is no longer "treated as having manufactured, produced, or constructed personal property which the corporation sells merely because the property is sold in a different form than the form in which it was purchased." *Id.*

transforming. Indeed, nothing in the Manufacturing Exception requires the CFC *itself* to have manufactured anything. That's because the Exception creates a fiction as to the identity of the "manufacturer." Remember, FBCSI doesn't include sales income that a CFC earns "in connection with the sale of personal property manufactured . . . by such corporation . . . from personal property which it has purchased." 26 C.F.R. § 1.954-3(a)(4)(i). And "[i]f purchased personal property is substantially transformed prior to sale, the property sold will be treated as having been manufactured . . . by the selling corporation." *Id.* § 1.954-3(a)(4)(ii).

Note the passive language here. A CFC "is treated" as having manufactured the property it sold if the property "is substantially transformed" before sale. This language means "there is no requirement in the statute or regulations that the CFC's own employees or some other dependent service provider furnish the manufacturing services that transform the product." Dolan, et al., US Taxation of International Mergers, Acquisitions & Joint Ventures § 18.06 at *8 (Oct. 2020). All that the regulation requires is that "the property sold is in effect not the property . . . purchased," 26 C.F.R. § 1.954-3(a)(4)(i), such as when the property "is substantially transformed," *id.* § 1.954-3(a)(4)(ii). So "[o]nce the determination is made that property sold is not the same as the property purchased, it is a foregone conclusion that the CFC is the manufacturer." Dolan, *supra* at *8.

That the Exception doesn't require the CFC itself to manufacture the goods becomes clearer when we look at another exception to (d)(1). This is the Component-Part Exception. Under it, a Related-Person Transaction doesn't generate FBCSI "[i]f purchased property is used as a component part of personal property which is sold." 26 C.F.R. § 1.954-3(a)(4)(iii). But before a CFC qualifies for this exception, the regulation requires that "the operations conducted by the selling corporation in connection with the property purchased and sold [be] substantial in nature." *Id.* That Treasury included this requirement for the Component-Part Exception but not for the Manufacturing Exception suggests the omission in the latter was intentional. *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citations

omitted)).  So there is no requirement in the Manufacturing Exception that the CFC itself must manufacture the property.

The Manufacturing Exception creates a simple syllogism.  FBCSI does not include the income a CFC earns by selling property it earlier purchased if, in between purchase and sale, it "manufactured" that property.  And a CFC is considered to have manufactured the property if the property "is substantially transformed prior to sale."  Thus, if property has been substantially transformed before its sale, the income a CFC earns through the sale is not FBCSI.  And because the property LUX bought—raw materials—was substantially transformed into functioning household appliances before LUX sold it, I believe LUX's sales income qualifies for the Manufacturing Exception.

At the very least, there's a question of fact over whether LUX "manufactured" the appliances.  And that should've precluded summary judgment, not only on § 954(d)(1), but also on (d)(2).[6]

III.

This isn't an easy case.  But in the end, I believe the statute and its regulations lay out a clear path: Apply the (d)(1) framework and exceptions to the (d)(2) branch transaction.  Doing so here means LUX didn't generate FBCSI.  Even if we don't want to take it that far, there is, at the very least, a disputed fact over whether LUX qualifies for the Manufacturing Exception.  And that should've precluded summary judgment.

For these reasons, I respectfully dissent.

---

[6]I acknowledge that my proposed resolution of this case depends, in large part, on Treasury's relevant regulations.  Whirlpool, as part of its argument here, challenges the validity of those regulations.  But because the majority believes that (d)(2) defines FBSCI by its own terms, it doesn't address the regulations.  And because I believe that Whirlpool should prevail under the applicable regulations as written, I also leave the validity of the regulations to another day.